IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 3, 2016

**STATE OF TENNESSEE v. JOE WILLIS**

**Appeal from the Criminal Court for Shelby County**
**No. 13-05650     John Wheeler Campbell, Judge**

**No. W2015-01839-CCA-R3-CD  -  Filed September 9, 2016**

The Defendant-Appellant, Joe Willis, was convicted by a Shelby County jury as charged of two counts of aggravated assault, one count of aggravated burglary, one count of theft of property valued at $500 or less, and one count of evading arrest, and the trial court imposed an effective ten-year sentence. In his sole issue on appeal, Willis challenges the sufficiency of the evidence supporting his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Stephen C. Bush, District Public Defender; Harry Eugene Saylee, III (on appeal), and Constance J. Barnes (at trial), Assistant Public Defenders, Memphis, Tennessee, for the Defendant-Appellant, Joe Willis.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Amy P. Weirich, District Attorney General; and Kirby May, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

In the predawn hours of June 15, 2013, Memphis Police Department Officers Fredrick Reading and Kimberly Shannon responded to a burglary alarm call at an apartment located at 2939 Wedge Cove. While investigating the burglary, Officer Reading encountered Willis at the back door of this apartment and fired at him after Willis pointed a shotgun in the direction of both officers. Although Willis was hit by one of these bullets, he was able to run through the neighborhood until he found a friend who drove him to a hospital in Southaven, Mississippi. Following an investigation, the Shelby

County Grand Jury indicted Willis on two counts of aggravated assault, one count of aggravated burglary, one count of theft of property $500 or less, and one count of evading arrest.

As relevant to the issues raised by Willis in this appeal, the facts presented at the June 2015 trial were as follows: Carolyn McCallcum left her apartment at 2939 Wedge Cove the night of June 14, 2013, to seek hospital treatment for a migraine. As she was leaving the emergency room at approximately 3:00 a.m. on June 15, 2013, McCallcum noticed a message from her alarm company stating that the alarm in her apartment had been triggered. When she arrived home, McCallcum noticed that her bedroom light was on, even though it had been turned off when she left. She also saw the shadow of a person "pacing" in her bedroom. McCallcum got back in her car, and when she exited the apartment complex, she noticed a man in a silver car who left the parking lot just before she did. McCallcum found Officer Reading and Officer Shannon in their patrol cars near the entrance to her complex and flagged them down. The officers told her that they were responding to an alarm call at her apartment, and she informed them that she had seen someone in her apartment. When McCallcum and the officers arrived at her apartment, they heard a noise from the back of her unit, and both officers walked in that direction. McCallcum, who stayed at the front of the apartment, heard someone running through leaves and then heard one of the officers say, "Stop, freeze, don't move[.]" A moment later, she heard gunshots. McCallcum then saw the two officers and a third individual, whom she could not identify, running from the apartment.

When she was allowed to return to her home later that day, McCallcum found that her apartment had been ransacked and that the glass in her patio door had been shattered. A Michael Kors purse worth $200 to $300, a smaller purse, and her son's coin jar containing approximately $5 in change were missing. McCallcum said that she did not know Joe Willis, the Defendant-Appellant, and that she had never given Willis, or anyone else, permission to enter or remove items from her apartment.

Officer Fredrick Reading and his partner, Officer Kimberly Shannon, responded in uniform to an alarm call at 2939 Wedge Cove around 2:50 or 2:55 a.m. on June 15, 2013. They arrived at the apartment complex at approximately 3:10 a.m., and although they initially went the wrong way, McCallcum flagged them down and took them to her apartment. As the officers were discussing the alarm call with McCallcum, they heard the sound of glass breaking from the rear patio area of McCallcum's apartment. Officer Reading walked to the back of the unit, shined his flashlight in the area, and saw an individual, whom he later identified as Willis, stepping through McCallcum's shattered patio door. Officer Shannon, who was following closely behind Officer Reading, also saw this man stepping through the patio door.

The officers were able to see the perpetrator because they had light from Officer Reading's flashlight, light from the patio area of the apartment next door, and light from the parking lot. At the time, the man exiting the apartment was wearing a red hat and red "jersey" with a white undershirt and was carrying a shotgun in his hand. Officer Reading pointed his flashlight at this individual and yelled, "Police, drop the gun." He then grabbed his firearm, pointed it at the perpetrator, and again told him to drop the shotgun. The perpetrator, who was still holding the shotgun, immediately catapulted over several fences before reaching a fence that was too high to jump.

As both officers pursued him, Officer Reading continued to yell, "Police, drop the gun, drop the gun." At one point, the perpetrator attempted unsuccessfully to enter an apartment located at 2945 Wedge Cove. Officer Reading said that the perpetrator turned around, "racked the shotgun," and pointed it at him and Officer Shannon, who was standing slightly behind Officer Reading. Officer Shannon said that although this man pointed the shotgun in their direction, she did not see him chamber a round or put his hand on the trigger. Officer Reading said he felt "scared for [his] life" and Officer Shannon stated that she was "fearful" when the perpetrator turned toward them and pointed the shotgun in their direction. Officer Reading immediately fired three shots, hitting the perpetrator once and shattering the glass door behind him, and the perpetrator fell through this door. As he fell, the perpetrator dropped a cell phone just outside the door but carried the shotgun with him inside the apartment.

Officer Reading stayed at the back of the apartment while Officer Shannon ran around to see if the perpetrator would emerge from the front door of the apartment at 2945 Wedge Cove. An instant later, Officer Shannon saw this man exit the front door of the unit and run southbound on Hickory Hill Road. She did not see the perpetrator with the shotgun as he fled. Officer Reading, who heard Officer Shannon announce on the radio that the perpetrator had run out the front door, proceeded to the front of the apartment to help with the chase. A short time later, Officer Shannon saw the perpetrator, without his shotgun, at a retirement community across the street from McCallcum's apartment before losing sight of him again. At 3:17 a.m., Officer Reading called in "a shots fired" message over the police radio, describing the perpetrator as "[m]ale black, red hat, red shirt, with a shotgun." Both officers continued to look for this man until other officers arrived at the scene. Officer Reading later identified Willis, the Defendant-Appellant, as the perpetrator from a photographic lineup, and Officer Reading and Officer Shannon both identified Willis at the preliminary hearing and at trial as the individual with the shotgun that they chased from 2939 Wedge Cove to 2945 Wedge Cove on June 15, 2013. Both officers acknowledged that they did not see Willis with a purse or a jar of coins and did not recover these items during their pursuit of him.

-3-

Tarshella Jackson was riding home from a nightclub near McCallcum's apartment around 3:20 a.m. on June 15, 2013, when she saw a man running down Hickory Hill Road with a "long" gun. She described the individual as an African-American man wearing a red and white hat, a red shirt, and blue jeans. After seeing this man and the large number of police cars at an apartment complex in the area, Jackson called 9-1-1. She provided the description of the man and informed the operator that she had seen the man run into the bushes behind a fast food restaurant. Jackson acknowledged that the man she saw was on the opposite side of a five-lane street and that she was not wearing her corrective eyeglasses at the time she observed him.

Officer Geoffrey Redd responded to the scene to help locate the perpetrator around 3:00 a.m. on June 15, 2013. When he got to the retirement community, he saw a man cross the street and jump over the fence. Officer Redd tried unsuccessfully to enter the area. He then ran down the fence line following the individual, who was wearing a white shirt and white hat, but eventually lost sight of him. Officer Redd later found a hat, a shirt, and a glove on the ground inside the retirement community. He acknowledged that he did not see this individual carrying a shotgun when he jumped over the fence.

Officer Brandon Hazlerig responded to a call from B'Angelo Hall, who stated that he had seen a man with a gunshot wound at the Bella Vista Apartments at the intersection of Hickory Hill Road and Knight Arnold Road. Hall described this man as a "male black, five foot eight, two hundred and twenty pounds, [with] a mustache/goatee." He said the man had "no shirt on, . . . was injured, had a gunshot wound to . . . the right side [of his chest,] . . . had a tattoo of a gun on his right side[,] . . . [and] had blue jeans on that were . . . torn in the back." Officer Hazlerig provided this description to the other officers participating in the search.

Sergeant Tonie Ray-Williams also met with B'Angelo Hall at the Bella Vista Apartments. She learned that Hall had allowed the man with the gunshot wound to use his cell phone. As she and other officers were talking with Hall, Willis's father called Hall's cell phone and spoke to an officer. Sergeant Ray-Williams eventually spoke to Willis's mother on the phone and learned that the man with the gunshot wound who had borrowed Hall's phone was Joe Willis.

Jeremiah Spencer stated that Willis, who went by the nickname of "Fulltime," knocked on the front door of his apartment, which was located south of Knight Arnold Road, around 5:00 a.m. on June 15, 2013. Willis was bleeding from his abdomen and was not wearing a shirt. Spencer and his wife gave Willis a shirt and drove him to the Baptist Desoto Hospital in Southaven, Mississippi. Spencer said Willis had not asked to go to the hospital in Southaven and that he and his wife took him there because they were

not aware of hospitals closer to their home. He said Willis did not have anything in his hands when he arrived at his home and that Willis never told him how he had gotten shot.

Sergeant Wesley Fullilove and Sergeant Sharon Sparks of the Southaven Police Department responded to a call from the Baptist DeSoto Hospital at 6:00 a.m. on June 15, 2013, to talk to Willis. Sergeant Sparks interviewed Willis, who had been shot on the right side of his abdomen, before he was transported to the Regional Medical Center in Memphis for treatment.

Investigator Charles Cathey went to McCallcum's apartment to collect evidence. Although he attempted to lift fingerprints from several items, he was unable to recover any usable prints inside McCallcum's apartment.

Investigator Christopher Sanders photographed, collected, and secured evidence in this case. He noted that McCallcum's glass patio door had been shattered and that her apartment had been ransacked. He collected a cell phone that had been found outside McCallcum's apartment and collected another cell phone and several spent shell casings outside the second apartment located at 2945 Wedge Cove. He also observed a substance, appearing to be blood, on the floor of the apartment at 2945 Wedge Cove and took swabs of it for deoxyribonucleic acid (DNA) testing. A purse, containing a smaller purse, and a coin jar with $9.66 inside were found in a ditch behind a home at 3011 Oakland Hills, which was approximately two blocks south of McCallcum's apartment complex. No fingerprints were recovered from the jar of coins.

Investigator Sanders also collected a maroon Alabama cap from the retirement community near McCallcum's apartment and a black glove from the parking lot of that complex. In a grassy area between the retirement community and 5972 Pebble Beach, he collected a red shirt, containing a substance that appeared to be blood, and a red bandana. At the Pebble Beach address, he collected a white shirt, which also contained a substance appearing to be blood. Both shirts seemed to have a bullet hole in the front, right area. Investigator Sanders acknowledged that neither the purses nor the coin jar appeared to have blood on them. He also acknowledged that a shotgun was never recovered in this case.

Kristyn Meyers, a Special Agent Forensic Scientist with the Tennessee Bureau of Investigation, conducted a biological examination of the evidence collected in this case. A buccal swab was taken from Willis on August 22, 2014, and delivered to the Tennessee Bureau of Investigation for DNA testing. Agent Meyers was able to obtain a partial DNA profile from the blood stains inside the apartment at 2945 Wedge Cove that was consistent with Willis. She also obtained a partial DNA profile from the cap, the white undershirt, the glove, and the bandana that was consistent with Willis's DNA. Finally,

Agent Meyers obtained a complete DNA profile from the blood on the red shirt that matched Willis's DNA.

Lieutenant Wilton Cleveland analyzed one of the cell phones collected in this case. He determined that the password for this phone was Willis's birthday, that the phone contained the numbers of individuals who had visited Willis in jail, and that Willis was depicted in some of the photographs saved on the phone. The cell phone contained a series of text messages between a person by the nickname of "Fulltime" and an individual named Chi Racc between June 12, 2013 and June 15, 2013. On June 12, 2013, Fulltime asked Racc to come over the following day so they could "get some money." When Racc asked Fulltime if the plan was "legit" or if they would be "robbin" somebody, Fulltime replied, "[S]ome legit shit from da door, but if some illegal shit present itself, we can handle that too." Racc said he would be over at 6:00 p.m. On June 13, 2013, at 8:17 p.m., Racc texted Fulltime that he was outside his home. At 8:22 p.m., Fulltime said he was "about to pull up."

The cell phone also showed that in the early morning hours of June 15, 2013, Racc sent some texts to Fulltime that he did not read. At 3:09 a.m., Racc texted four times, "[Da] car just bust that right, don[']t know who it is.[349; Exh. 53]." At 3:10 a.m., Racc texted Fulltime seven times, "[T]hey bak g.[349; Exh. 53]."

Willis stated that he did not commit the crimes in this case and denied ever being inside McCallcum's apartment. He said that on the night of June 14, 2013, he went to the Silver Spoon nightclub and left between 2:30 and 3:00 a.m. When he was unable to find a ride home, he began walking and ended up at the Crossings at Fox Meadows Apartments, where he stopped to urinate behind units 2939 and 2945 Wedge Cove. He heard a car stopping and then heard someone say, "Don't move, freeze, don't move." Willis said he turned to the right to see who was speaking to him and was shot on his right side. Willis then jumped over the fence into the patio area and dropped both of his cell phones as two more shots were fired, one of which shattered the glass patio door of the apartment. Willis then crawled into the apartment.

Although Willis denied having a shotgun at the time, he admitted he was wearing a maroon jersey, a white undershirt, and a cap that night. When he heard voices saying that they were going around to the front of the apartment, Willis exited the back door of the apartment, jumped the fence, crossed the street, and ran through a retirement community. He took off his cap and rested a moment before he started running again, eventually jumping a fence at the retirement community and running through a backyard in the Pebble Beach neighborhood before ending up on Hickory Hill Road. He then encountered B'Angelo Hall, who allowed him to use his cell phone. From there, Willis jumped the fence to get into the apartment complex where Jeremiah Spencer lived.

Willis knocked on Spencer's door, and Spencer gave him a shirt and a towel for the bleeding and drove him to the hospital in Southaven, Mississippi. He was later transported to the Regional Medical Center in Memphis. Willis said he never saw any police cars, never saw anyone in a police uniform, and never heard anyone identify themselves as police to him that night.

Willis admitted that after being shot, he ran by numerous homes and businesses without stopping to ask for help. He also admitted he called his mother, rather than 9-1-1, when he used B'Angelo Hall's cell phone. Willis said he dropped both of his cell phones as he was running. He acknowledged texting with Chi Racc earlier that day but claimed the texts referencing illegal conduct had to do with shoplifting. Willis denied having a shotgun and denied pointing a shotgun at Officer Reading and Officer Shannon. He said that the first time he saw McCallcum's purses or the coin jar was at trial.

## ANALYSIS

On appeal, Willis contends that the evidence is insufficient to sustain his convictions for two counts of aggravated assault, one count of aggravated burglary, and one count of theft of property valued at $500 or less. He asserts that the State failed to prove his identity as the perpetrator of the aggravated burglary and theft offenses. He also maintains that the State failed to prove he intended to cause Officers Reading and Shannon to reasonably fear imminent bodily injury for the aggravated assault offenses. We conclude that the proof was sufficient to support all of Willis's convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the "strongest legitimate view of the evidence as well as all reasonable…inferences…[that may be drawn from that evidence]." State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of

review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

Willis does not contend that the State failed to establish the elements of aggravated burglary and theft. See T.C.A. §§ 39-14-403(a), -402(a)(1) (A person commits aggravated burglary when he or she, without the effective consent of the owner, enters a habitation with intent to commit a felony, theft or assault.), 39-14-103(a) ("A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."), 39-14-105(a)(1) (Theft of property is a Class A misdemeanor if the value of the property is $500 or less). Instead, he claims the State failed to establish his identity as the perpetrator of these offenses beyond a reasonable doubt because much of the evidence, with the exception of the testimony from Officers Reading and Shannon, indicated he did not commit these offenses.

Willis denies that he was inside McCallcum's apartment, that he had a shotgun, or that he took the purses or coin jar. He also highlights the fact that the shotgun he allegedly possessed that night was never recovered, that no physical or DNA evidence placing him inside McCallcum's apartment was found, and that neither B'Angelo Hall nor Jeremiah Spencer saw him carrying a shotgun, purse, or coin jar the night of the incident. Moreover, Willis asserts that no officers involved in the chase, including Officers Reading and Shannon, saw him with the purse or the coin jar and that several officers, including Officers Shannon and Redd, admitted that they did not see him carrying anything, including a shotgun, after he left the area of the apartments. While Willis concedes that Tarshella Jackson said she saw him running with a "long" gun, he asserts that Jackson was not wearing her glasses and was in a car traveling the speed limit on the other side of a five-lane street at the time she claimed to see him. In addition, while he acknowledges that the purse and the coin jar were found in the backyard of a home located at 3011 Oakland Hills, he contends that the State never explained how these items got to that location. Willis asserts that "[t]he probability that he was in the

same general vicinity when someone burglarized Ms. McCallcum's apartment is not enough to convict him of the burglary or the theft."

"The identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing Strickland, 885 S.W.2d at 87).

The evidence presented at trial showed that Officers Reading and Shannon saw Willis, who was holding a shotgun, exiting McCallcum's apartment through the broken glass of the patio door. Officer Reading identified Willis as the perpetrator in a photographic lineup, and both Officer Reading and Officer Shannon identified Willis as the perpetrator at the preliminary hearing and at trial. The officers said that Willis was wearing a red shirt over a white undershirt and had on a red or maroon hat. Officer Reading identified himself as a police officer and told Willis to drop the gun, and Willis ran from the officers and jumped over several fences. When Willis reached a fence that was too high to jump, Officer Reading told him to drop the shotgun, and Willis turned around and pointed the gun at both Officer Reading and Officer Shannon. Officer Reading then shot Willis one time, and Willis ran through the apartment at 2945 Wedge Cove and into the surrounding neighborhood.

Moments later, Tarshella Jackson saw patrol cars around McCallcum's apartment complex and observed a man, who was wearing a red shirt and a red and white cap and carrying a "long" gun, running down Hickory Hill Road. She promptly called 9-1-1. Close to the same time, Lieutenant Wong and Officer Redd also saw a man, who was wearing a white undershirt, jump over a fence into a retirement community. Willis, who was not wearing a shirt and had an obvious gunshot wound, later encountered B'Angelo Hall at an apartment complex at the intersection of Hickory Hill Road and Knight Arnold Road and borrowed Hall's cell phone to call his mother. Willis then went to Jeremiah Spencer's apartment, which was located nearby, and Spencer and his wife drove Willis to a hospital in Southaven for treatment of the gunshot wound to his abdomen. A short time

later, Willis's parents called B'Angelo Hall's cell phone, talked to police, and identified their son, Joe Willis, as the individual who had been shot and who had used Hall's phone.

McCallcum, when allowed to return to her apartment, realized that two purses worth $200 or $300 and a jar of coins had been taken. In the area where the chase occurred, officers found two cell phones, a red shirt, a white undershirt, a maroon cap, a glove, and a bandana. Several of these items had what appeared to be blood on them, and a substance appearing to be blood was also collected from the floor of the apartment at 2945 Wedge Cove. Officers found McCallcum's purse and the jar of coins in a ditch approximately two blocks south of McCallcum's apartment. The DNA on the red shirt matched Willis's DNA, and the DNA on the white undershirt, cap, glove, bandana, and the blood on the floor of the apartment at 2945 Wedge Cove was consistent with Willis's DNA. Officers also found that one of the recovered cell phones belonged to Willis. In the days leading up to the offenses, Willis and Chi Racc texted about "get[ting] some money" and "robbin" somebody. At the time these crimes took place, Racc sent Willis several unread texts about seeing a car and warning him that someone was back. Accordingly, we conclude that the evidence is more than sufficient to establish Willis's identity as the perpetrator of the aggravated burglary and theft offenses. We also conclude that the proof is sufficient to sustain these convictions.

Willis also contends that the evidence is insufficient to sustain his two convictions for aggravated assault because the State failed to prove he intended to cause Officers Reading and Shannon to reasonably fear imminent bodily injury. Willis, in accordance with his trial testimony, claims that he was not armed with a shotgun that night, that he had not completely turned toward the officers when Officer Reading fired his gun, and that he was "peacefully urinating by the fence, outside of the apartment patios" at the time he was shot. He asserts that he did not cause the officers to reasonably fear imminent bodily injury because the evidence showed that he was fleeing with his back to them during the incident, that he had been shot and had fallen through the door to the second apartment by the time Officer Shannon caught up to Officer Reading, and that Officer Shannon never saw or heard him chambering a round in the shotgun and never saw his hand on the trigger.

In order to sustain the convictions for aggravated assault as charged in this case, the State was required to prove beyond a reasonable doubt that Willis intentionally or knowingly caused Officer Reading and Officer Shannon to reasonably fear imminent bodily injury by the use or display of a deadly weapon. See T.C.A. §§ 39-13-102(a)(1)(A)(iii), -101(a)(2) (Supp. 2012). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a). Regarding the definition of the term "knowingly," this court has concluded that the offense of aggravated assault contains both "nature of conduct" and

"result of conduct" elements. See State v. Szumanski Stroud, No. W2006-01945-CCA-R3-CD, 2007 WL 3171158, at *5 (Tenn. Crim. App. Oct. 29, 2007) (stating that the victim's being placed in fear of imminent bodily injury is a "result of conduct" element while the defendant's using or displaying a deadly weapon is a "nature of conduct" element). A person acts "knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). However, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. "Aggravated assault based on fear requires the victim to have a 'well-grounded apprehension of personal injury or violence.'" State v. Lonta Montrell Burress, Jr., No. E2013-01697-CCA-R3-CD, 2014 WL 6855226, at *8 (Tenn. Crim. App. Dec. 4, 2014) (quoting State v. Jones, 789 S.W.2d 545, 550-51 (Tenn. 1990)).

Viewed in the light most favorable to the State, the evidence is sufficient for a rational trier of fact to find beyond a reasonable doubt that Willis intentionally or knowingly caused Officer Reading and Officer Shannon to reasonably fear imminent bodily injury by the display of a deadly weapon. The officers testified that they were "scared" and "fearful" when Willis pointed the shotgun in their direction. Although Willis claims he did not have a shotgun and his conduct was innocent, the jury accredited the officers' testimony over Willis's testimony, as was its prerogative. See State v. Campbell, 245 S.W.3d 331, 335 (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, Willis's claim that he did not intend to place the officers in fear is unpersuasive because the proof established that Willis was reasonably certain his conduct would cause the officers to fear imminent bodily injury, thereby establishing the "result of conduct" element of fear in this case. A rational jury could have found that Willis was aware that his conduct, in brandishing the shotgun, caused Officers Reading and Shannon to reasonably fear imminent bodily injury. Therefore, we conclude the evidence is also sufficient to support Willis's two convictions for aggravated assault.

Although Willis does not challenge his conviction for evading arrest, we conclude that the evidence is sufficient to sustain this conviction as well. See T.C.A. § 39-16-603(a)(1)(A) (Supp. 2012) (making it unlawful for a person to intentionally flee from anyone the person knows to be a law enforcement officer if the person knows the officer is attempting to arrest him or her). The evidence established that when Officer Reading identified himself as a police officer and told Willis to drop the shotgun, Willis ran from him. When Officers Reading and Shannon, who were both in uniform, caught up to Willis and told him to drop the shotgun a second time, Willis ran through the apartment at 2945 Wedge Cove and into the surrounding neighborhood.

Given the evidence presented at trial, a rational jury could have found beyond a reasonable doubt that Willis committed the offenses of aggravated burglary, theft, aggravated assault against both officers, and evading arrest. Because the evidence is sufficient to sustain these convictions, Willis is not entitled to relief.

## **CONCLUSION**

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE